IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 20, 2019 Session

## STATE OF TENNESSEE v. WILLIAM GRANT MORGAN, ALIAS

**Appeal from the Criminal Court for Knox County**
**No. 97487     G. Scott Green, Judge**

_____

**No. E2018-02245-CCA-R3-CD**
_____

A Knox County jury convicted the Defendant, William Grant Morgan, alias, of first degree premeditated murder and possession of drug paraphernalia. He received concurrent terms of life imprisonment and eleven months and twenty-nine days, respectively. In this appeal as of right, the Defendant raises the following issues: (1) whether the evidence was sufficient to sustain the Defendant's murder conviction, specifically, challenging the element of premeditation; (2) whether the trial court failed to ensure that the Defendant voluntarily and knowingly waived certain defenses against the advice of his attorneys; (3) whether the trial court erred in admitting an autopsy photograph depicting the multiple cuts to the victim's throat; and (4) whether the trial court committed plain error by admitting evidence that the Defendant invoked his right to remain silent. After our review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Mark E. Stephens, District Public Defender; and Jonathan P. Harwell (on appeal) and John R. Halstead (at trial), Assistant District Public Defenders, for the appellant, William Grant Morgan, alias.

Herbert H. Slatery III, Attorney General and Reporter; Robert L. Coleman and Jeffrey D. Zentner, Assistant Attorneys General; Charme P. Allen, District Attorney General; and Leslie R. Nassios and Kyle Hixson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BAKGROUND

During the early morning hours on June 3, 2011, eighty-four-year-old Mary L. Harrison ("the victim") was found stabbed to death inside her Knoxille home that she shared with the Defendant, her grandson. Thereafter, a Knox County grand jury charged the Defendant with first degree premeditated murder and possession of drug paraphernalia. See Tenn. Code Ann. §§ 39-13-202, -17-425.

The Defendant's competency was questioned, and he was mentally evaluated in January 2013. Following his evaluation, the Defendant was found not competent to stand trial or assist in his own defense, and he was involuntarily committed for hospitalization. Another order for a competency evaluation was entered on August 21, 2015, and following this evaluation, the Defendant was deemed competent to stand trial. Thereafter, the Defendant was in court for a potential plea agreement on October 30, 2015. At the outset of the hearing, defense counsel[1] opined that the Defendant appeared competent at that time, and defense counsel indicated that they had filled out the plea agreement paperwork that morning. According to defense counsel, the Defendant, however, had been present in the courtroom listening to other defendants enter guilty pleas, and the Defendant no longer wished to enter a plea if he had "to surrender all of his constitutional rights." The Defendant informed the trial court that he did not wish to proceed with the plea agreement; no plea was entered; and the case was set for trial. The Defendant's trial took place on August 22nd and 23rd of 2016.

At trial, the State presented the following evidence.[2] In June 2011, the victim lived at 1406 Payne Road with her daughter Patti Shipley, her son-in-law Lamon Shipley, and her grandson the Defendant. Ms. Shipley, the Defendant's mother, lived in the main house with her husband, and the victim and the Defendant lived in a downstairs apartment attached to the house. The house the victim and the Defendant had lived in previously had fallen into disrepair, so they moved in with Mr. and Ms. Shipley in 2009. Ms. Shipley also testified that the victim suffered from congestive heart failure and had high blood pressure, and it was easier to care for the victim if she was close by. However, the victim only came to live with Ms. Shipley upon the condition that the Defendant could come as well. Ms. Shipley testified that the victim was good to the Defendant, helping him with expenses and providing him with things he desired.

Ms. Shipley explained that the victim had a night-time routine, usually going to bed around 9:30 p.m. Ms. Shipley said that the unemployed Defendant slept all day and

---

[1] The Defendant was represented by two public defenders. We will refer to them singularly and collectively as "defense counsel."

[2] The Defendant does not challenge his conviction for possession of drug paraphernalia on appeal. Therefore, we will limit our recitation of the facts to those relating to the murder conviction.

-2-

stayed up all night. According to Ms. Shipley, the victim was always careful with her purse and would carry her purse into her bedroom at night when she retired; she would put it on the bed, then later on the nightstand or dresser. The victim also slept with a flashlight for emergencies, but she did not keep any knives in her room. The State introduced a photograph of the victim's purse on the bed the way it was discovered by the officers, which reflected that someone had removed various items from inside and placed them on the bed.

On June 2, the victim told Ms. Shipley that Ms. Shipley needed to speak with the Defendant, although the victim did not indicate why Ms. Shipley should do so. Ms. Shipley testified that she tried to talk to the Defendant around 7:00 or 8:00 that night, but he would not talk to her, saying that he had "nothing to talk about." When the Defendant went back to his room, the victim, seeing the Defendant's response to his mother, just shook her head but did not explain further. Ms. Shipley was under the impression that the victim wanted the information to which she had alluded to earlier come from the Defendant, rather than from her.

That evening, after watching television with her mother in her mother's apartment, Ms. Shipley went upstairs, washed dishes, and went to bed. The next morning Mr. Shipley woke her up and told her there had been a stabbing. She "automatically thought that Billy cut his [sic] self because he was a cutter."

Ms. Shipley testified on cross-examination that the Defendant's anti-social behavior began in middle school, that he did not have many close friends, and that he did not talk much. According to Ms. Shipley, the Defendant had been a "cutter" for about ten years, beginning when he was approximately nineteen to twenty years old, and the Defendant would frequently cut his arm using a knife. Ms. Shipley said that she had to take the Defendant to get stitches twice and once had to call the Mobile Crisis Center. She relayed that in May 2010, there was a cutting incident after which she removed all of the pocket knives from the Defendant's bedroom and threw them away.

Mr. Shipley testified that prior to the killing, he had discussed a job opportunity with the Defendant to work as a security guard, which would allow him to work at nighttime and fit with his sleeping routine. However, the Defendant was worried about obtaining his GED in order to qualify for the position. According to Mr. Shipley, if the victim had ever told him that she did not want the Defendant to live her with her any longer, then the Defendant "would have been out of there"; the Defendant was likely aware this was the case.

At approximately 5:45 a.m. on June 3, 2011, a 911 call was received from 1406 Payne Road. In the call, a man identified himself as Billy Morgan and reported that he

had killed his grandmother by "cut[ting] her throat" and had stabbed himself. The man informed the operator that he was twenty-nine years old, that he was bleeding badly, and that the knife was lying outside. The 911 operator continued to talk to the caller until officers arrived on the scene. The recording was entered as an exhibit.

Knoxville Police Department ("KPD") Officer Jason Gardner testified that he responded to the 911 call. Upon arriving at 1406 Payne Road, he and KPD Officer Samuel McLane encountered a man, Lamon Shipley, walking to the front door of the residence. According to Officer Gardner, the man, Mr. Shipley, appeared confused as to why the officers were there. Mr. Shipley testified that he was watching the news around 4:30 or 5:00 in the morning, when he saw flashlights outside and discovered the police in his front yard. When the officers asked him about a stabbing, he did not know to what they were referring; it then "hit" him that they were referring to the victim and the Defendant.

Mr. Shipley told the officers that his stepson and mother-in-law lived in an apartment connected to the house downstairs. Upon approaching the apartment, the door to the apartment was locked. So, Mr. Shipley went back inside the house and unlocked the door from the inside. The officers then grabbed Mr. Shipley and pulled him out of the apartment because they were uncertain of what had happened inside. Mr. Shipley could see that the family dog was covered in blood, but he did not see either the victim or the Defendant upon entering the apartment.

The officers noticed blood on an interior door that led into the home. The lights were off but the back door was open. Upon further entry, they opened a bedroom door to find the victim lying on a bed on her back. She had "extensive wounds across her neck" and "lots of blood on her chest." She was unresponsive and not breathing. Officer Gardner opined that the victim appeared to be deceased; she was stiff and "kind of cold" to the touch.

The officers proceeded down the hallway and observed a trail of blood "trickl[ing] all the way down the hallway, even out the back door that was open." They approached a second bedroom door, but it was locked. Upon hearing a "kind of moan or some kind of gesture of help" from inside, they forced the door open. They found the Defendant lying on his back, covered in blood, with his throat cut "ear to ear" and cuts on his wrists. He had a phone lying beside him with an open line, but he was mumbling and gurgling and largely unresponsive. Upon engaging with the Defendant, the officers asked where the knife was located, and the Defendant said that it was outside in the back yard. The Defendant was taken to the University of Tennessee Hospital ("UT") to receive treatment for his injuries.

The officers followed the blood trail out the back door and found a folding silver pocket knife with a serrated blade, a blood-soaked red Beavis and Butthead t-shirt, and a large pool of blood next to the knife. Officer McLane believed that based upon the smears of blood, the Defendant had "crawled from the outside into his bedroom[.]"

Timothy Schade, with the KPD Forensic Unit, arrived and documented the scene, including taking numerous photographs that were admitted into evidence. Mr. Schade testified that the blood drops on the victim's knee were consistent with her bleeding while sitting up. Mr. Schade observed a big chunk of hair found in a trash can in the bathroom, although there was no blood there.

On cross-examination, Mr. Schade agreed that he did not see any blood on the victim's purse and that no attempt was made to get any fingerprints from the purse or the items lying on the bed. Mr. Schade further confirmed that no fingerprint or DNA analysis was performed on the knife. Deciphering the evidence from the crime scene, Mr. Schade opined that it appeared as if an individual was cut outside, leaving a pool of blood there, and then walked or crawled back into the bedroom. He agreed that the back door was open and that the fence in the back yard could have been scaled to gain entry into the apartment. In Mr. Schade's opinion, the pool of blood outside the house, down the hallway, and inside the Defendant's bedroom was fresher than the blood observed around the victim's body. Dr. Schade explained that he noticed dried blood on the victim.

Sergeant Colin McLeod of the Knoxville Police Department went to UT hospital to speak with the Defendant. Sergeant McLeod visited the Defendant there on three occasions. The first time Sergeant McLeod went, the Defendant was intubated and unable to speak. The second time, the Defendant was unconscious, though not intubated. The third time, June 4, Sergeant McLeod was able to speak briefly with the Defendant. This time, the Defendant was awake and did not appear to be under the influence of any medications, in Sergeant McLeod's opinion. Sergeant McLeod observed that the Defendant had several scratch marks down his arm, bruising on the back of his hand, bruising on his knuckles that appeared to come from striking something, and bandages on his throat. The Defendant's hair also appeared to have been cut. Photographs of the Defendant's appearance while hospitalized were entered into evidence.

Sergeant McLeod asked the Defendant some questions, including his name, date of birth, and social security number. The Defendant knew he was at UT hospital and was able to provided his identifying information. However, after answering these questions, the Defendant told Sergeant that he did not wish to talk. Sergeant McLeod opined that the Defendant appeared to be coherent during this conversation.

An audio recording of the interview was introduced as an exhibit. After the Defendant answered Sergeant McLeod's introductory questions, Sergeant McLeod read the Defendant his Miranda rights. The Defendant agreed that he understood them. The following exchange then took place:

SERGEANT McLEOD: Okay, so you know what that means, right? So basically I'm just saying you don't have to talk to me if you don't want to. And if you don't want to, you just let me know. Do you know why you're here?
THE DEFENDANT: Uh . . . (unintelligible) . . . hospital.
SERGEANT McLEOD: Huh?
THE DEFENDANT: Cause they chose this hospital.
SERGEANT McLEOD: No, I mean do you know why you're in the hospital?
THE DEFENDANT: I do not wish to talk to you.
SERGEANT McLEOD: Hm?
THE DEFENDANT: I don't wish to talk anymore.

That concluded the interview.

According to Sergeant McLeod, the Defendant was released from the hospital the following day on June 5. Sergeant McLeod thought that the Defendant's voice matched the voice of the 911 caller who reported the murder. Sergeant McLeod confirmed that the phone number for the telephone landline in the apartment the Defendant shared with his grandmother matched the phone number on the 911 call sheet.

On cross-examination, Sergeant McLeod agreed that the Defendant became agitated following their exchange and began punching himself in the throat. He could not recall exactly how many times the Defendant hit himself. Sergeant McLeod confirmed that no fingerprint analysis was performed on the victim's purse, that no attempts were made to fingerprint anything else inside the house, and that no DNA evidence was ever tested.

Dr. Darinka Mileusnic-Polchan, the Knox County Medical Examiner, performed an autopsy on the victim on June 4, 2011. The autopsy revealed that the victim "died of multiple incised wounds of the neck, which involved the muscles, larynx, right internal jugular vein, right carotid artery, cervical vertebrae, and hyoid bone[,]" and that the manner of death was homicide. Dr. Mileusnic-Polchan divided the victim's sharp-force injuries into twelve descriptions in her autopsy report. Dr. Mileusnic-Polchan catalogued the victim's defensive wounds in a separate section of her autopsy report, including eleven descriptions of defensive wounds. She opined that the victim might have taken up

-6-

to a one-half hour to die from her injuries and explained that this was not a sudden, immediate death.

She noted that the descriptions for the victim's sharp-force wounds one through four were lengthy and complex because the wounds were "large, very irregular injuries with irregular ragged torn margins" to the victim's neck. These injuries consisted of "many different wounds superimposed on each other." They also included several different slashes or attempts to penetrate the skin as well as stab wounds. Based on the damage to the internal organs and structures, Dr. Mileusnic-Polchan thought that the victim had been stabbed at least six times in the neck, but the victim could have been stabbed or slashed a dozen or more times, though Dr. Mileusnic-Polchan was unable to say for certain. She noted other stabbing injuries were present, both near the main injury as well as in other areas of the victim's face. She explained that the wounds were inflicted in multiple different directions, one possibly even being an exit wound.

The victim's defensive wounds were largely on the victim's hands and fingers and showed her trying to defend herself or grab the knife. These injuries showed evidence of having been inflicted with a serrated blade. They were consistent with having been inflicted at the same time as the injuries on the victim's face and neck.

Dr. Mileusnic-Polchan found evidence an "expectoration pattern" in the crime scene photographs, meaning that the victim had inhaled blood and coughed it up. The victim had also swallowed blood, and blood was observed in her airway during autopsy. Some of the blood drips Dr. Mileusnic-Polchan saw in the photographs suggested that the victim was sitting up and bleeding onto her thighs and knees at some point. Dr. Mileusnic-Polchan also noted dried blood in the crime scene photographs. Dr. Mileusnic-Polchan opined that the victim might have died before midnight, as evidenced by the facts that the victim was wearing her nightgown, had her dentures in, had rings on her fingers, and may have been seated upright when one of the blows occurred.

In addition to the autopsy report, Dr. Mileusnic-Polchan also prepared a diagram that charted the injuries with their length and depth. Both were entered as exhibits.

The State rested, and following a full Momon[3] colloquy, the Defendant elected not to testify. The defense introduced by stipulation the Defendant's medical records related to his transportation to and stay at UT hospital due to his self-inflicted injuries.

---

[3] Referring to the prophylactic procedure outlined in Momon v. State, 18 S.W.3d 152 (Tenn. 1999), which is designed to ensure that a defendant's waiver of his right to testify is voluntarily, knowingly, and intelligently entered.

Following the conclusion of proof, the jury convicted the Defendant as charged. The trial court imposed concurrent sentences of life imprisonment for the murder conviction and eleven months and twenty-nine days for the misdemeanor conviction. After denial of the Defendant's motion for new trial,[4] he filed a timely notice of appeal. The case is now before us for our review.

## ANALYSIS

On appeal, the Defendant argues that the evidence was insufficient to sustain his murder conviction; that the trial court failed to ensure that the Defendant voluntarily and knowingly waived certain defenses; that the trial court erred in admitting an autopsy photograph depicting the multiple cuts to the victim's throat; and that the trial court committed plain error by admitting evidence that the Defendant invoked his right to remain silent. We will address each in turn.

### I. Sufficiency

The Defendant contends that the evidence adduced at trial was insufficient to support his conviction for first degree premeditated murder. Specifically, he challenges the element of premeditation, asserting that the State failed to establish the killing was sufficiently free from excitement or passion. The State responds that the evidence was sufficient.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the

---

[4] The Defendant's motion for new trial was timely filed on September 6, 2016. However, nothing occurred again until an amended motion for new trial was filed over two years later on December 5, 2018, which was the same day the motion for new trial hearing took place. The record does not indicate the reason for the protracted delay.

evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). "Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence" because "premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." Davidson, 121 S.W.3d at 614-15.

-9-

According to the Defendant, the State "provided no evidence" of his state of mind at the time of the killing, and in the Defendant's opinion, the evidence "strongly suggested" otherwise, i.e., that he had "a disordered or excited mind," especially given his suicide attempt in the aftermath. The Defendant maintains that there was also no evidence of motive.

In addition, the Defendant cites to the non-exclusive <u>Bland</u> factors and contends that the circumstances surrounding the killing do not support the element of premeditation beyond a reasonable doubt; specifically, he mentions that there was no evidence of any declarations of the intent to kill, as to how or when he obtained the knife, of preparations before the killing for concealment of the crime, or of destruction or secretion of evidence after the crime. The Defendant also notes that he called 911 to report the crime and that he was suicidal after the killing. Though the Defendant acknowledges the severity and cruelty of the killing of the unarmed victim, including the multiple stab wounds, he submits that this evidence alone was not sufficient to establish premeditation because "[a]n unarmed victim can be killed in a passion just as an armed victim" and "the medical examiner here did not testify that these wounds were inflicted over a protracted period of time."

The State maintains that the evidence proved premeditation beyond a reasonable doubt, commenting that the Defendant procured a serrated knife in advance of the killing because his mother had previously removed all knives from the Defendant's bedroom in May 2010; that the Defendant used the serrated knife to inflict "at least a dozen stabbing and slashing wounds" on the unarmed victim who tried to defend herself, causing her more injuries in the process; that the Defendant let his devoted grandmother "die over several minutes," possibly taking as long as one-half hour, as the victim "swallow[ed] and aspirat[ed] blood"; that the Defendant "tried, at least to some extent, to hide evidence of the killing" by taking the knife into the back yard; and that the Defendant only called "911 after [the victim] had been dead for some time" and he had injured himself. Relative to the Defendant's state of mind, the State avers that the Defendant's mother's testimony established "that something was amiss between the victim and the [D]efendant in the hours immediately leading up to the killing" and that the Defndant "self-injured as a way of mitigating his culpability for a premeditated murder."

We agree with the State that the element of premeditation was proved beyond a reasonable doubt. The Defendant notes that the medical examiner did not testify that wounds were inflicted over a protracted period of time; nonetheless, given the different kinds of wounds, both stabbing and slashing; the different directions in which the wounds were inflicted; the repetitive nature of the wounds; the fact that the victim aspirated and swallowed her own blood; and the presence of several defensive wounds to the victim's wounds; the evidence reflected that the killing took place over a span of some time even

-10-

if the medical examiner did not explicitly state such. "[A]lthough the particular circumstances of each case will differ, stab wounds have been found to be more consistent with a premeditated killing than other types of wounds because the act of stabbing, by its very nature, requires more effort, time, and intimate contact than does simply pulling the trigger of a gun." State v. Adams, 405 S.W.3d 641, 663 (Tenn. 2013); see also State v. Kenny Thomason, No. M2014-00592-CCA-R3-CD, 2016 WL 368200, at *12 (Tenn. Crim. App. Jan. 28, 2016). Such is surely the case here given the nature of the wounds, the type of knife used, the multiplicity of the stabs and slashes, and the relationship between the victim and the Defendant.

According to testimony from Ms. Shipley, there were no knives in either the victim's or the Defendant's bedrooms, inferentially establishing that the Defendant procured the knife in some fashion before killing his grandmother. Also, the eighty-four-year-old victim was unarmed. Although the evidence of motive was scant, the State did show that the victim and the Defendant had been in discussions about a sensitive matter, that the victim had informed the Defendant's mother that something was amiss, and that the victim's purse had possibly been rifled through by the unemployed Defendant.

Relative to the Defendant's failure to render aid to the victim, though the Defendant ultimately called 911, he only did so apparently after several hours had passed and he had injured himself. According to Officer Gardner, the victim was stiff and cold to the touch upon their arrival. Dr. Mileunsic-Polchan testified that the evidence indicated that the victim was killed sometime before midnight, but the 911 call was not received until 5:45 a.m. the following morning. Dr. Mileunsic-Polchan stated that it may have taken the victim up to one-half hour to die from her wounds.

Both parties argue that the Defendant's suicide attempt in the aftermath of the killing support their respective positions. While defense counsel was limited by the Defendant's wishes, the jury heard some evidence of the Defendant's mental health issues, including his anti-social behavior and history of cutting. The jury was in the best position to assess and weigh the mental health evidence presented. The jury, as was their prerogative, rejected any argument on the Defendant's behalf that the killing was the result of an excited and disordered mind, including therein that the Defendant's premeditation was negated by his subsequent suicide attempt or history of mental illness.[5] Any subsequent suicide attempt could just as easily have been interpreted as evidence of the Defendant's consciousness of guilt after he brutally stabbed his own grandmother. We will not second-guess the jury's decision in this regard.

---

[5] We note that the closing arguments are not included in the appellate record.

As stated above, premeditation is often proved by circumstantial evidence, there being no direct proof of a defendant's state of mind. Here, we find the proof, in the light most favorable to the State,[6] sufficient to establish that the Defendant premeditatedly and intentionally killed the victim.

## II. Defense Waiver

Prior to the beginning of trial, defense counsel informed the court that the Defendant had given them instructions not to argue facts that would lead to conviction for a lesser-included offense and wanted only all-or-nothing argument. Defense counsel indicated that the Defendant did not want any admission of guilt; however, the Defendant would allow defense counsel "to argue in the abstract that the State has to prove certain elements of the crime including that it was done with premeditation, which is a part of that includes it has to be done in the absence of passion." Defense counsel remarked that this was not their "preferred way to try the case." The trial court inquired, "So identity is at issue?" and defense counsel responded affirmatively.

Defense counsel cited to Zagorski v. State, 983 S.W.2d 654 (Tenn. 1999), and explained why he was bringing this issue to the trial court's attention:

> There is the [Zagorski] case which basically was where a defendant was allowed to not present any evidence in the penalty phase of a death penalty case and the question became was that appropriate for him to be allowed to make that decision, and the [Tennessee Supreme Court] had sweeping language essentially that the defendant makes decisions such as how to pursue a defense, what to pursue, of that nature. It was more sweeping than even I really anticipated what decision someone gets to make. But what they also said, at least in the context of the penalty phase, they wanted an on the record discussion with the defendant to make sure that he is doing, you know, making this knowingly and voluntarily.
>
> There's a couple of other cases I've given the State which show that that has been applied because of the sweeping language to basically the trial portion of the case. One even is where the defendant wanted a self-defense, self-defense only. The defense team argued heat of passion, the [c]ourt said

---

[6] Relative to the secretion of evidence, we decline the State's invitation to find that the Defendant attempted to secret or hide the murder weapon by taking it into the back yard. The evidence suggested that he harmed himself at this location and then crawled or walked back to his bedroom. The Defendant also told the officers where the knife was located. Any inference that the Defendant attempted to secret or hide is tenuous at best. Such evidence does, however, suggest that the Defendant had some time to reflect on his actions following the killing.

that was error because he told you not to do it but said it was harmless under those facts. So we don't know those cases because they come up in post-conviction afterwards, don't really deal with this question of do you need an on the record discussion about this. But just in an abundance of caution we wanted to raise that issue because, you know, we're having to try the case one way, it's not, you know, the way we would have chosen to try it but we have told [the Defendant] that, he understands it fully, but still that's what he wants to do.

In response to defense counsel's statements, the trial court asked, "Are you requesting that the [c]ourt voir dire [the Defendant] about what you've just discussed?" Defense counsel replied, "No, I'm not necessarily requesting it, but . . . ." The trial court then interjected, stating that defense counsel had put the issue "on the record," that the Defendant was present, and that the Defendant had heard everything that had just been said. The trial court then spoke with the Defendant:

> TRIAL COURT: Obviously, . . . this is your day in court. It's not your lawyer's day so you get to make the decisions about your case. You should listen to them, they are very, very good lawyers, they can give you advice, but at the end of the day, whatever decision this jury makes affects your life, not theirs. And I—but you have given them instructions on how you want this case tried, is that correct?
> THE DEFENDANT: Yes, sir.
> TRIAL COURT: All right. All right, you get to make the call.
> THE DEFENDANT: Yes, sir.
> TRIAL COURT: Did you hear everything [defense counsel] just said?
> THE DEFENDANT: Yes, sir.
> TRIAL COURT: All right. You're in agreement with that?
> THE DEFENDANT: From what I can understand I just wanted to plead not guilty, I did not commit this heinous charge.
> TRIAL COURT: All right. You have that right and that's why we have juries try these cases, to let them make the decision.
> THE DEFENDANT: Yes, sir.

That concluded the discussion on the issue.

The Defendant submits that the trial court erred in failing to conduct an adequate inquiry into whether he "was voluntarily and knowingly instructing his attorneys to purse only a defense that he did not kill [the victim]." According to the Defendant, Zagorski v. State, 983 S.W.2d 654, 660-61 (Tenn. 1998), sets out "the procedure that should be followed when a defendant gives [defense] counsel instructions that limit the potential

-13-

defenses against the attorney's advice[.]"  The Defendant notes that "the Zagorski rule arose in the context of waiver of mitigating evidence in a capital case," but he avers that it also covers the selection of a defense strategy in a non-capital trial.

According to the Defendant, defense counsel "appropriately informed the trial court that [the Defendant] had instructed [defense] counsel not to pursue a defense that he was guilty only of a lesser offense, which otherwise [defense] counsel would have pursued in light of the facts in the case."  The Defendant continues,

> Once that happened, the trial court was required—as indeed defense counsel informed the court—to conduct a Zagorski colloquy: to verify that [the Defendant] understood his rights and their importance, that he had discussed this with [defense] counsel, and that he understood the risks of proceeding with a defense that was against the advice of counsel.

The Defendant surmises that the colloquy which occurred here "fell far below the standard required in Zagorski."  Furthermore, the Defendant opines that the error cannot be considered harmless under the circumstances because "there was a significant argument that, even if he had been the killer, [the Defendant] had not acted with premeditation and free from passion sufficient to establish first-degree murder[, y]et the defense was prohibited from making the most of this argument."

In Zagorski, the Tennessee Supreme Court held that a competent capital defendant has the right to waive the presentation of mitigating evidence during the penalty phase of his or her trial.  983 S.W.2d at 658-59; see also State v. Kiser, 284 S.W.3d 227, 244 (Tenn. 2009).  To aid the trial courts in determining whether to permit the waiver of mitigating evidence by capital defendants in prospective cases, our supreme court in Zagorski provided the following guidelines for use when the issue of waiver of mitigating evidence arises in a capital case:

> [W]hen a defendant, against his counsel's advi[c]e, refuses to permit the investigation and presentation of mitigating evidence, counsel must inform the trial court of these circumstances on the record, outside the presence of the jury.  The trial court must then take the following steps to protect the defendant's interests and to preserve a complete record:

> 1. Inform the defendant of his right to present mitigating evidence and make a determination on the record whether the defendant understands this right and the importance of presenting mitigating evidence in both the guilt phase and sentencing phase of trial;

2. Inquire of both the defendant and counsel whether they have discussed the importance of mitigating evidence, the risks of foregoing the use of such evidence, and the possibility that such evidence could be used to offset aggravating circumstances; and

3. After being assured the defendant understands the importance of mitigation, inquire of the defendant whether he or she desires to forego the presentation of mitigating evidence.

983 S.W.2d at 660. The Zagorski Court explained that "[t]his procedure will insure that the accused has intelligently and voluntarily made a decision to forego mitigating evidence." Id. The Zagorski Court cautioned, however, that the trial court "shall not inquire of counsel as to the content of any known mitigating evidence" because doing so "would potentially force counsel to act against the client's wishes and would risk the disclosure of privileged or confidential information." Id. at 660-61.

The State replies that this argument is waived because the Defendant did not make a specific request for a Zagorski colloquy. Arguing for waiver, the State explains that defense counsel "mentioned Zagorski, but when the trial judge asked if he wanted the court to voir dire the [D]efendant, he said, '[n]o, I'm not necessarily requesting it[,]'" and that "[b]y so doing, the [D]efendant explicitly abandoned his claim to a Zagorski colloquy."

The Defendant responds to the State's waiver claim, maintaining that the State mischaracterizes the exchange between defense counsel and the trial court. The Defendant submits that the trial court interrupted defense counsel after defense counsel's "incomplete comment," "No, I'm not necessarily requesting it, but . . . ." According to the Defendant, "it is clear that counsel was in the middle of reiterating his view that he personally was not comfortable with this precedent, and would prefer for his decisions not to be constrained by his client, but that such was the existing state of the law." The Defendant continues, "Before [defense counsel] got to the end of this explanation, however, the [trial c]ourt interrupted and cut him off, declaring directly that it believed counsel had met his obligations: 'I mean you've put it on the record.'" The Defendant surmises that this "extended discussion," including a discussion of the law requiring a colloquy, "went far beyond the minimal standards for preserving issues."

Initially, we agree with the State that the Defendant's claim is waived. During the exchange, the issue that was brought to the trial court's attention was the Defendant's desire to proceed with a defense strategy that was contrary to the recommendations of his trial counsel. Defense counsel noted the holding in Zagorski and the possible need for an on-the-record discussion regarding whether a defendant was voluntarily waiving his right

-15-

to certain defense strategies. However, when the trial court asked defense counsel if he was making a specific request for voir dire of the Defendant about what had just been discussed, defense counsel replied "not necessarily." Although the trial court did interject during defense counsel's response, the trial court proceeded to question the Defendant about his decision; that concluded discussion on the issue; and defense counsel did not object to the colloquy as conducted or request additional questioning. Had defense counsel done so, either a ruling could have been made by the trial court that further questioning was unnecessary, or the trial court could have formulated more specific questions in an effort to comply with Zagorski.

In cases in which the "issues are only tentatively suggested or the record only partially and incompletely developed[,] . . . [c]ounsel necessarily take some calculated risks in not renewing objections." See State v. Walls, 537 S.W.3d 892, 899 (Tenn. 2017) (citing State v. McGhee, 746 S.W.2d 460, 462 (Tenn. 1988). Moreover, our supreme court "has further recognized the importance of a contemporaneous objection to procedures utilized by the trial court in addition to evidentiary issues." Id. "Objections to improper procedure must be voiced contemporaneously to give the trial judge the opportunity to correct the error on the spot. In the absence of a contemporaneous objection, any error was waived." Id. (citing State v. Estes, 655 S.W.2d 179, 186 (Tenn. Crim. App. 1983)) (emphasis added in original). Because no objection was lodged to the specifics of the colloquy and no further discussion ensued regarding the validity of the Defendant's decision and waiver, we believe the issue, whether the specific dictates of Zagorski applies to a defendant's waiver of certain viable defenses in a non-capital case, under these circumstances is waived.

Waiver aside, the State asserts that the Defendant is not entitled to relief because "Zagorski's colloquy requirement does not apply in this non-capital case" and that "the colloquy the trial court conducted here certainly satisfies the lesser demands of a non-capital case." Plenary review having been waived, our review is limited to plain error.

The Tennessee Supreme Court has adopted a five-factor test for determining whether an error should be recognized as plain:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000). It is a defendant's burden to persuade the appellate court that all five criteria for plain error relief are present. State v. Hatcher,

-16-

310 S.W.3d 788, 808 (Tenn. 2010). "If a defendant fails to establish any of these criteria, an appellate court must deny relief under the plain error doctrine, and an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." State v. Minor, 546 S.W.3d 59, 67 (Tenn. 2018) (citing State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015)).

The Defendant cites to State v. Terry Norris, No. W2000-00707-CCA-R3-CD, 2002 WL 1042184 (Tenn. Crim. App. May 21, 2002), in support of his proposition that Zagorski applies to the selection of a defense strategy in a non-capital case. In Norris, the defendant raised the argument in the context of ineffective assistance of counsel, contending that his trial counsel were ineffective for focusing on a defense of voluntary manslaughter, which was contrary to "his desire to argue to the jury that he acted in self-defense when he shot the victim[.]" 2002 WL 1042184, at *10. In rejecting the Norris defendant's argument, this court analyzed Zagorski and reasoned as follows:

> In Zagorski, . . . the Tennessee Supreme Court addressed the issue of "whether a lawyer should follow the lawful demands of his client when those demands may cause detriment to the client's case." [983 S.W.2d] at 658. The court concluded that "[w]hen a competent defendant knowingly and voluntarily chooses a lawful course of action or defense strategy, counsel is essentially bound by that decision." Id. at 658-59. Relying upon Tennessee Supreme Court Rule 8, the court stated, "Generally, the client has exclusive authority to make decisions about his or her case, which are binding upon the lawyer if made within the framework of the law." Id. at 658. In reaching its conclusion, the court emphasized that a criminal attorney's role is to assist his or her client in making a defense and to represent the client in court. Id. The attorney must ensure that the defendant is "fully advised of his or her rights, the available defense strategies, and the consequences of pursuing one strategy over another." Id. However, the court concluded that "[u]ltimately . . . the right to a defense belongs to the defendant." Id.

> The record here indicates that counsel adequately informed the [d]efendant of the available defense strategies and of the possible consequences of pursuing a self-defense strategy over the defense of voluntary manslaughter. However, . . . it appears that despite being fully informed of the consequences of his actions, the [d]efendant continued to wish to pursue a self-defense strategy. Under such circumstances, according to our supreme court, a lawyer must defer to the wishes of his client, regardless of the consequences.

Norris, 2002 WL 1042184, at *13-14.

The Defendant also cites to State v. Joseph Newton, No. M2014-00603-CCA-R3-CD, 2015 WL 1543386, at *6 (Tenn. Crim. App. Apr. 2, 2015), as support for his argument that Zagorski applies in the present circumstances. In Newton, the issue was again raised in the context of ineffective assistance of counsel. Prior to trial, Newton and his trial counsel had agreed to adopt a defense of consent to the charges of rape given the presence of DNA evidence, but on the day of trial, "the defendant changed his mind and 'insisted' that he did not commit the crime and indicated to trial counsel that he would not be waiving his right to testify." 2015 WL 1543386, at *6. As a result, trial counsel crafted his trial strategy around the defense of mistaken identity in accordance with the defendant's wishes. Id. On appeal to this court, the defendant submitted that trial counsel was ineffective because he failed to present a defense of consent regardless of the defendant's express decision to the contrary. Id. Again, this court found no merit to defendant Newton's ineffective claim.

First, the panel cited Zagorski, noting that "trial counsel is 'essentially bound' by a competent defendant's knowing and voluntary selection of a particular defense strategy." Newton, 2015 WL 1543386, at *6 (citing Zagorski, 983 S.W.2d at 658-59). The panel continued, "While trial counsel may warn the defendant about consequences that may stem from pursuing an ill-advised legal strategy, 'the right to a defense belongs to the defendant.'" Id. (quoting Zagorski, 983 S.W.2d at 658-59, and citing Norris, 2002 WL 1042184, at *14). Next, the panel determined that trial counsel was not deficient, reasoning,

> The fact that the defendant's strategy of choice resulted in a verdict to his detriment does not then render trial counsel ineffective. Because the right to effective assistance of counsel does not mean that a defendant cedes all participation in his defense to the discretion of trial counsel, a defendant has a right to choose a defense strategy and to reject counsel's advice regarding adverse consequences of that strategy. Trial counsel informed the defendant of the legal strategies at his disposal and the disadvantages of adopting an identity defense in light of the overwhelming DNA evidence against him. Despite trial counsel's warnings that a consent defense was the only "plausible defense" in light of the DNA evidence against the defendant, the defendant made the choice to employ a defense of mistaken identity, and he indicated that he would testify that he had nothing to do with the crime.

Id.

-18-

While both Norris and Newton held that a defendant has the right to determine the nature of the defense, neither of them support the Defendant's argument that a Zagorski colloquy is required once the issue of a defendant's waiver of defenses is brought to the attention of the trial court. Those cases arose in the post-conviction context, and they make clear that it is the attorney's role to ensure that the defendant is fully advised of his or her rights, the available defense strategies, and the consequences of pursuing one strategy over another. Nothing from their holdings imposes a duty upon a trial court to conduct a colloquy of any kind.

We also note that it appears that defense counsel's duty was complied with in this case. Defense counsel stated that the Defendant had been informed of the available defense strategies and of the possible consequences of pursuing a less-than-advantageous defense, but that the Defendant chose to proceed nonetheless. The Defendant, albeit somewhat ambiguously, affirmed as much to the trial court.

Moreover, Zagorski involved the presentation of mitigating evidence during the penalty phase of a capital defendant's trial. See 983 S.W.2d at 658-59. Our supreme court has on numerous occasions recognized the heightened due process applicable in capital cases, the heightened reliability required, and the gravity of the ultimate penalty in capital cases. Smith v. State, 357 S.W.3d 322, 346 (Tenn. 2011) (collecting cases). Because the Defendant has failed to establish that a clear and unequivocal rule of law has been breached, that a substantial right has adversely affected, or that consideration of the error is necessary to do substantial justice, plain error relief is unwarranted.

*III. Autopsy Photograph*

On August 18, 2016, several days before trial was to begin, the Defendant filed a motion in limine, seeking to exclude "gruesome and unfairly prejudicial photos of the victim in this case, and also the crime scene video showing the victim, along with any autopsy photos." The Defendant maintained, "Those photos, mainly showing the cuts to the victim's neck, are gruesome and would cause the jury to decide the case based on emotion instead of on the facts."

Prior to jury selecition, the trial court held a hearing on the motion in limine. Defense counsel argued for exclusion of "all photographs of the victim with her throat cut" because they were too inflamatory and prejudicial. Defense counsel submitted that the medical examiner's diagram was sufficient to explain the wounds. The trial court commented that the State had some latitude to establish intent in a first degree murder case by showing the ferocity of the attack. The State responded that depicting the crime scene and the nature of the victim's wounds was relevant and necessary to establish the

element of premeditation, including issues about the timing of the attack, how long the victim had been dead, and the Defendant's state of mind in the interim.

The trial court then reviewed multiple photographs that the State sought to present. Relative to autopsy photographs, the trial court was shown four different photographs taken from the respective right and left sides of the victim's head. The trial court determined that three photographs of the left side of the victim's head were admissible— one showed the victim's entire head from the left side and the significance of the major wound to the throat from that side; the next was a closer view of the left side of the victim's face, showing the side of the major wound to the victim's throat, bruising, a number of smaller wounds, and the various directions of the victim's wounds; and the next was an even closer view of a particular wound to the left side of the victim's face that had unique characteritics reflecting that the victim was stabbed from different angles. The trial court excluded one autopsy photograph depicting the right side of the victim's face as duplicitous, reasoning that the relevant information was conveyed in a "better fashion" from photographs of the victim's left side.

The trial court was then shown two frontal photographs of the victim's entire head showing the extensive wound to the throat; the photographs were number 673 and 677. The trial court told the prosecutor "to pick out which one" was "the most relevant." The prosecutor replied that both photographs were relevant to show the number of injuries and the multi-directions from which they were inflicted. The following discussion ensued:

THE PROSECUTOR: . . . 677, Dr. Mileusnic-Polchan thinks is the best for her purposes, but that would require me to get in, you know, the photos that show the chin injuries. So
THE COURT: General, I can say this that I have been—
THE PROSECUTOR: So that's 673—
TRIAL COURT: —doing this for [twenty-eight] or [twenty-nine] years and have looked at thousands of autopsy photographs and that photograph is disturbing to me, so . . . [l]et me think about that one.

Subsequently, after discussion about photographs of the victim's hands, the trial court inquired, without referencing particularly 673 or 677, "What will Dr. Mileusnic[-Polchan] say is the significance of the frontal shot showing the whole wound? What is the—how will that photograph assist her and explain to the jury what her opinion of what happened to this victim?" The State explained,

To show that he is . . . stabbing her multiple times, from different directions, that . . . she is probably upright when some of these blows are

-20-

inflicted, and so that begs that question of how can somebody stay upright when they're receiving this many wounds . . . . He meant to kill her and . . . . And, you know, the particular cruelty of a crime is something that a jury can consider on the issue of premeditation[.]

The trial court again said, "I will think about this one, the rest of them are admissible[.]"

Ultimately, the trial court granted the Defendant's motion in part by excluding four photographs,[7] denied the motion in part by allowing the admission of nine photographs, and reserved ruling on photographs 673 and 677. The crime scene video was not discussed, and it was not admitted at trial.

When trial began the second day, the trial court again discussed admission of the frontal autopsy photograph. The trial court stated, "I'm not going to allow the frontal picture of that wound. I mean where you're looking down into her neck." The trial court opined that there were other ways for the medical examiner to describe the wound. The trial court reiterated, "I've looked at thousands of autopsy photographs in my life and if it bothers me it's going to bother a juror." When asked why the photograph was necessary, the prosecutor replied that it would show "[a] sustained, prolonged attack on [the victim] from multi-directions." The prosecutor pleaded, "Slashing and stabbing–I don't. I don't have that show the entire—that show the entirety of that assault. I don't." The trial court asserted its belief that other photographs could convey that information but that it would listen during a jury-out hearing to the medical examiner's rationale for admission of the photograph before issuing a final decision; however, the trial court remarked that it was not inclined to allow it.

The trial court revisited the issue during trial, noting that it was "allow[ing] the Sate the opportunity to change [the court's] mind" about admission of the photgraph. The trial court noted that the prosecutor had "worked very hard to crop out and to eliminate certain photographs," but that the court was still struggling with admission of photograph 673. The court held a jury-out hearing prior to Dr. Mileusnic-Polchan's testifying before the jury, and Dr. Mileusnic-Polchan was questioned about how the photograph could illuminate her testimony and assist a jury in understanding the victim's injuries.

Dr. Mileusnic-Polchan testified that it would be difficult to explain or describe, without the use of the photograph, "the dimensions and the appearance of the injuries" due to their complexity. She noted that while the injury to the victim's throat was "quite large," each area of trauma was "sort of a compilation . . . or complex sum of many

---

[7] It does not appear that these four photographs are a part of the record on appeal.

-21-

injuries." She commented that the main injury consisted of, at the very least, "half a dozen different slashes and stabs," and that other stabbing injuries were present, both near the main injury as well as in other areas of the victim's face. She indicated that the wounds were inflicted in multiple different directions. Dr. Mileusnic-Polchan opined that the photograph was necessary to adequately explain the complex nature of the victim's injuries to the jury because description alone was not sufficient to illuminate the complexity of the throat injury and how many different cuts or stabs were possibly present.

Upon cross-examination, Dr. Mileusnic-Polchan observed that the margins of the wound were indicative of the different trajectories of the slashes. She explained how these different trajectories were evident in the photograph. She said that "the pattern" of the victim's injuries were inconsistent with a single slash or stab from the knife found at the scene. She agreed that it took expertise like hers to note the nuances of the throat injury and that a layperson would likely just see "a very, very, open, very big injury to the throat."

Dr. Mileusnic-Polchan said that the diagram she prepared, charting the injuries with their length and depth, only showed "superficial dimensions" and not the depth of the wounds. While the diagram did reflect "the direction of the superficial wounds," it did not "necessarily depict the directionality" of the complex wounds.

After this, the trial court reversed its prior ruling excluding the photograph. It reasoned,

> You know, and sometimes you just have to react to certain of these issues by how it impacts you. Yesterday when I saw that picture it struck me one way, quite frankly when I'm looking at it today, it's not striking me the same way. Perhaps others would see other photographs which they might consider to be gruesome in a different fashion.

> I'm going to allow the photograph . . . . [O]bviously this is a photograph which the doctor has opined aids in her determination and findings and opinions and can assist her in explaining to the jury.

The trial court also commented that the State was required to prove that this was an intentional act and that the Defendant acted with premeditaiton. The trial court continued, "I mean if this photograph depicts, according to what I understand the doctor testify—will testify multiple injuries, significant trauma from different angles, showing distinct injuries, I think it's fair game." The trial court indicated that yesterday, it "would have agreed with" defense counsel that all the jury would see was "a big mass of red"

-22-

when shown the photograph, but today, it was of a different opinion following Dr. Mileusnic-Polchan's testimony "that you can see distinctive places within that photograph" and that it would assist her with her explanation. The trial court cautioned the prosecutor not to "overdo it" with the photograph.

On appeal, the Defendant again challenges admission of an autopsy photograph showing the significant injury to the victim's throat. He submits that the gruesome photograph "shed no light on any disputed issue in the case and tended to inflame the jury." The Defendant notes that the trial court initially found the photograph "disturbing" and bothersome but "suddenly deemed it tolerable"; that "[t]his was a full-page enlarged color photograph of a gaping wound, and no lay person could look at it and be unmoved"; and that "the photograph shed no more light on the number and different kinds of wounds (stab or slash wounds)" than did Dr. Mileusnic-Polchan's hand-drawn diagram, asserting that it was Dr. Mileusnic-Polchan's testimony that was necessary to describe the wounds, not the photograph, because the nuances of the injuries depicted therein were not perceptible by the jury. The Defendant surmises that the probative value of this photograph was minimal but its prejudicial effect was "enormous" and that its admission was not harmless due to the lack of dispute that the victim was stabbed to death and the "thin" proof of premeditation.

The State responds that the trial court acted within its discretion in admitting the photograph because it was highly probative to illustrating Dr. Mileusnic-Polchan's testimony regarding the victim's injuries, which in turn was an important part of the State's proof regarding premeditation. According to the State, Dr. Mileusnic-Polchan's diagram was inadequate because it did not show the "depth" and "directionality" of the wounds. The State asserts that although the trial court had originally indicated otherwise, its ultimate decision to admit the photograph was not capricious as the Defendant claims, but was well-reasoned after hearing voir dire testimony from Dr. Mileusnic-Polchan.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. See State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; Banks, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. Id. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. Id. at 949; see also State

v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

Autopsy photographs must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case. Banks, 564 S.W.2d at 951. Moreover, "[p]hotographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." State v. Willis, 496 S.W.3d 653 (Tenn. 2016) (quoting State v. Derek Williamson, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011)). "Thus, the fact that the State could have made its case using only descriptive words is a consideration in balancing the probative value against the prejudicial effect, but does not mandate exclusion of the photographs." Id.

Photograph 673 admitted into evidence showed a comprehensive view of the injuries to the victim's throat. The frontal photograph was highly probative of the nature of the victim's injuries. It was the only photograph of its nature that was admitted into evidence; we note that photograph 677, apparently a second frontal photograph of the victim's throat injury, was not admitted into evidence. The other autopsy photographs of the victim's face show only the left side and did not provide a complete view of the main injury. During the jury-out hearing, Dr. Mileusnic-Polchan testified that her diagram charting the victim's injuries was illustrative but did not capture the complexity of the victim's wounds, and that using the photograph was necessary to depict the "depth" and "directionality" of the wounds. Accordingly, admission of photograph 673 was not multitudinous in nature.

Although the trial court initially considered the photograph overly gruesome, it later found that despite the photograph's graphic nature, it was offered to illustrate the medical examiner's testimony regarding the victim's various injuries. The trial court also commented that intent and premeditation were elements that the State was required to prove in a first degree murder case and determined that the photograph was admissible for these purposes based upon Dr. Mileusnic-Polchan's testimony. "Insofar as the photograph[] tend[ed] to be shocking or gruesome, it [was] because the crime depicted [was] of that sort." Willis, 496 S.W.3d at 729 (citing State v. Sandles, 740 S.W.2d 169, 177 (Mo. 1987) (en banc)).

We agree with the State that the trial court's decision was not impetuous but was well-reasoned. The photograph was relevant to the issue of the Defendant's premeditation and intent, and its probative value was not substantially outweighed by its gruesome or horrifying character. See, e.g., State v. Troy Lynn Fox, No. M2013-00579-

-24-

CCA-R3-CD, 2014 WL 820573, at *12 (Tenn. Crim. App. Feb. 28, 2014) (concluding that crime scene photographs were relevant to the issue of defendant's premeditation and intent and that their probative value outweighed any gruesome or horrifying character); State v. Andre Harris, No. W2011-02440-CCA-R3-CD, 2013 WL 2424115, at *10-11 (Tenn. Crim. App. June 5, 2013) (finding no abuse of discretion in the trial court's admission of twenty autopsy photographs). Accordingly, we find no error in the trial court's decision to admit the frontal photograph.

### IV. Evidence of Invocation of the Right to Remain Silent

Although the Defendant acknowledges that no objection was raised at trial, he argues that the trial court committed plain error when it permitted introduction of evidence—through Sergeant McLeod's testimony, as well as the audio recording—that the Defendant invoked his right to remain silent after his being given Miranda warnings. The Defendant cites to Wainwright v. Greenfield, 474 U.S. 284 (1986),[8] for the principle that evidence a defendant has invoked his right to remain silent is not admissible as substantive evidence and that a "straightforward violation" of said right occurred in this case. Furthermore, according to the Defendant, he "could not have benefited from the introduction of this evidence, and there was no tactical reason not to object." The Defendant surmises, "The jury could have used this to view [the Defendant] as being conscious of the magnitude of his guilt or as sufficiently free from passion to be able to invoke his rights in a calculated fashion."

The State responds that the trial court did not plainly err in admitting evidence that the Defendant invoked his right to remain silent. The State asserts that the Defendant has failed to establish certain plain error factors in order to receive relief; specifically, contending that the lack of an objection was likely tactical due to "the passing nature of this mention" and defense counsel's desire not to bring attention to the evidence; that no clear and unequivocal rule of law was breached because the State did not make any improper "evidentiary use" of the Defendant's invocation of right to silence, also citing to Greenfield, 474 at 292; and that the Defendant was not denied substantial justice given the overwhelming evidence of his guilt. Finally, the State notes that although no specific instruction was given to the jury that it could not draw an inference of guilt from the Defendant's invocation of his right to remain silent, the trial court "did instruct the jury that the [D]efendant was presumed innocent and that the jury could not draw any inference of guilt from the defendant's" declining to testify at trial; this instruction could

---

[8] In Greenfield, the United States Supreme Court found a violation of the Due Process Clause when the prosecution was permitted to introduce evidence that the defendant had "exercised his right to remain silent and . . . expressed a desire to consult counsel before answering any questions," as inconsistent with his insanity defense. 474 U.S. at 287, 289-95.

-25-

inferentially be applied by the jury to the Defendant's invocation of his right to remain silent, in the State's estimation.

The Defendant acknowledges that the issue is reviewable only for plain error given the lack of objection at trial. See, e.g., State v. Aaron Dean Lawson, No. E2014-01788-CCA-R3-CD, 2015 WL 6083243, at *13 (Tenn. Oct. 16, 2015) (reviewing the issue for plain error). Again, we note that it is a defendant's burden to persuade the appellate court that all five criteria for plain error relief are present, and if a defendant fails to establish any of these criteria, an appellate court must deny relief under the plain error doctrine.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court announced procedural safeguards to protect a defendant's Fifth Amendment rights during custodial interrogation. Dickerson v. United States, 530 U.S. 428, 444 (2000) (holding that Miranda announced a binding "constitutional rule" under the Fifth Amendment). Ten years later, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment forbids impeachment of a defendant at trial for choosing to exercise his Fifth Amendment right to remain silent after receiving Miranda warnings. Doyle v. Ohio, 426 U.S. 610, 619-20 (1976); State v. Frasier, 914 S.W.2d 467, 471 (Tenn. 1996). Subsequently, in Greenfield, unlike Doyle, the defendant's silence was used as affirmative proof in the case in chief, not as impeachment. Greenfield, 474 U.S. at 292. The Court found the distinction immaterial and again condemned a "breach[] [of] the implied assurance of the Miranda warnings [as] an affront to the fundamental fairness that the Due Process [C]lause requires." Id. at 291. The Supreme Court emphasized that "[t]he point of . . . Doyle . . . is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter . . . us[e] the silence to impeach [him]" or otherwise "make use of the . . . exercise of those rights in obtaining his conviction." Id. at 292. Thus, the Court declared that "[w]hat is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the . . . assurance" of Miranda. Id. at 295 (emphasis added).

In Greer v. Miller, 483 U.S. 756, 764 (1987), the appeal resulted from a prosecutorial question to a witness which "touched upon [the defendant's] post-arrest silence." Unlike in Doyle and Greenfield, however, the trial court sustained defendant Miller's prompt objection to the question, instructed the jury to "ignore" it, and allowed no "further questioning or argument with respect to [the defendant's] silence[.]" 483 U.S. at 759, 764. In applying Doyle, the Supreme Court deemed it "significant that in each of the cases in which [the] Court ha[d previously] applied Doyle, the trial court . . . permitted specific inquiry or argument respecting the defendant's post-Miranda silence." Id. at 764. Because defendant "Miller's post-arrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference," the Court

-26-

determined that "no Doyle violation occurred." Id. at 764-65. "Greer thus teaches that 'Doyle does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel, but instead guards against the exploitation of that constitutional right by the prosecutor.'" State v. Dotson, 450 S.W.3d 1, 56 (Tenn. 2014) (quoting Lindgren v. Lane, 925 F.2d 198, 202 (7th Cir. 1991)). The Tennessee Supreme Court has endorsed these principles. See id. at 55-58 (holding that there was no Doyle or Greenfield violation from a police officer's two isolated references that the defendant invoked his right to counsel where the prosecution did not exploit the issue).

At trial, the Defendant did make an issue of his mental state before, during, and after the killing, including his history of cutting and his attempted suicide. See Lawson, 2015 WL 6083243, at *13. Ms. Shipley testified on cross-examination about the Defendant's anti-social behavior beginning in middle school, including that he did not have many close friends and did not talk much. Ms. Shipley also described the Defendant as a "cutter," who cut his arm frequently, and she said that she had to take the Defendant to get stitches twice and once had to call the Mobile Crisis Center. She relayed that in May 2010, there was a cutting incident after which she removed all of the knives from the Defendant's bedroom. Also, the Defendant admitted his medical records related to his transportation to and stay at UT hospital due to his self-inflicted injuries. The admission of the recording did not ask the jury to make a forbidden inference from the Defendant's silence. By playing the recording, the State presumably sought to show that the Defendant was coherent and able to comprehend and answer questions despite having some mental health challenges. The State, in fact, asked Sergeant McLeod if the Defendant appeared coherent during this conversation.

Importantly, we also note that the Defendant's statements were not emphasized by Sergeant McLeod during his direct testimony. Sergeant McLeod merely confirmed that the Defendant answered a few introductory questions before telling him that he no longer wished to speak with him; no mention was made of Miranda by the State or Sergeant McLeod. Although closing arguments were not transcribed, no allegation has been made that the prosecutor improperly commented on the Defendant's invocation of his right to remain silent therein. Thus, it does not appear from the record that the evidence was introduced for the purpose of highlighting the Defendant's decision to remain silent and having his guilt inferred therefrom.

What is more, the issue was raised in the motion for new trial but was not discussed during the hearing. Although presented with an opportunity to place the matter on the record at that time, defense counsel failed to make any argument that the decision not to object was anything other than tactical. The Defendant asserts on appeal that there was no tactical reason to fail to object; however, it was possible defense counsel wanted

the jury to hear the Defendant's angst while hospitalized.[9]   After the recording was played, defense counsel was able to elicit testimony from Sergeant McLeod that the Defendant became agitated following their exchange and began punching himself in the throat, further calling into question the Defendant's mental health.

The Defendant has not proven that a substantial right was adversely affected, that any waiver was not tactical, or that consideration of the error is necessary to do substantial justice.  He likewise has failed to establish a complete record for meaningful appellate review of the issue.  In consideration of the foregoing, we conclude that the Defendant has failed to meet the criteria for plain error relief in this regard.

CONCLUSION

Because we conclude that the Defendant's issues lack merit, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[9] Relative to tactical advantage, the State asserts that defense counsel may not have objected to the recording in order to not draw attention to the Defendant's statements and due to "the passing nature of this mention."  However, there is no reason to believe that the defense was not in possession of this recording prior to trial commencing and, therefore, could have lodged an objection at some point prior to the witness's trial testimony and outside of the jury's presence.  Relative to substantial justice, we likewise decline the State's invitation to infer anything from the fact that the jury was properly instructed not to draw any inference of guilt from the defendant's exercising his right not testify.  Again, such an inference is tenuous at best.